UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

V.A., individually and as mother and
natural guardian of K.A.D.,

                Plaintiff,

          -against-

CITY OF NEW YORK and THE NEW YORK
CITY DEPARTMENT OF EDUCATION,

                Defendants.

------------------------------------x

**MEMORANDUM & ORDER**
20-CV-0989(EK)(RML)

ERIC KOMITEE, United States District Judge:

       Plaintiff V.A. — the parent of a child with special

educational needs — brought this action against the City of New

York and its Department of Education (collectively, the "City")

under the Individuals with Disabilities in Education Act, 20

U.S.C. §§ 1400–1482.  She seeks review of the administrative

decision denying her request for retroactive tuition

reimbursement.  Before this Court are the parties' cross-motions

for summary judgment.  V.A. argues that she is entitled to

reimbursement for the tuition she paid for her child, K.A.D.,

for the 2018–19 school year because the City failed to timely

offer K.A.D. a "free appropriate public education" as required

by the IDEA.  She contends both (1) that the City failed timely

to mail one of the documents comprising such an offer, thus

violating the IDEA's procedures, and (2) that the offer was substantively inadequate.

Because the City has not shown that the mailing was timely made, I grant in part V.A.'s motion for summary judgment, deny the City's cross-motion in part, and remand for the SRO to consider in the first instance (1) whether the school at which V.A. placed K.A.D. that year was an appropriate placement and (2) whether the equities favor relief.

## I. Background

The IDEA requires any school district that receives funding assistance under the Act to provide a "free appropriate public education" (FAPE) to every child with a disability.  20 U.S.C. § 1412(a)(1)(A); *see also id.* § 1401(9) (defining FAPE). The New York City Department of Education (DOE) is subject to the IDEA's requirements.  *See* Defs.' Local Civil Rule 56.1 Statement ("City 56.1") ¶ 3, ECF No. 38.[1]

"To ensure that qualifying children receive a FAPE, a school district must create an individualized education program (IEP) for each such child." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  The IEP is a "written statement that sets out the child's present educational performance,

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  It has been described as the "centerpiece of the IDEA's education delivery system."  *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002).

**A.   K.A.D.'s IEP and the School Location Letter**

V.A. lives with K.A.D. in Queens, New York.  Am. NYSED SRO R. ("R.") at 569:1–12, 583:23–584:7, 679, ECF No. 22. K.A.D. has been receiving special education services from the City since she repeated kindergarten in 2010–2011.  SRO Decision 3, ECF No. 47-1; R. at 34.  She was first diagnosed with a specific learning disability in reading in 2012.  SRO Decision 3.  In seventh grade, the school year prior to the year at issue, K.A.D. attended the Lowell School, a "nonpublic school that has been approved . . . as a school with which districts may contract for the instruction of students with disabilities." SRO Decision 3 n.2; R. at 720.  DOE has not paid for tuition for this year; rather, V.A. paid the enrollment deposit, and her contract with the Lowell School obligates V.A. to pay the remainder of the tuition.  R. at 592:1–595:4.

On June 8, 2018, the City's Committee on Special Education 3 ("CSE 3") developed K.A.D.'s Individualized Education Program ("IEP") for the 2018–19 school year (eighth

grade).  R. at 766–82.  The IEP recommended that she be placed in a "12:1 + 1 class" for mathematics, English and language arts, social studies, and science in a DOE *non-specialized* school.  R. at 774, 779.  (Although the record does not make it clear, a "12:1 + 1 class" appears to refer to a class consisting of "twelve students, one teacher, and one paraprofessional." *Jennifer D. v. N.Y.C. Dep't of Educ.*, 550 F. Supp. 2d 420, 425 (S.D.N.Y. 2008).)  The IEP also recommended weekly or semiweekly special education teacher support services in mathematics, counseling, occupational therapy, physical therapy, and speech-language therapy, as well as assistive technology on an as-needed basis.  R. at 774–75.  The IEP noted that enrollment at a "specialized" school was considered but rejected, on the basis that K.A.D. "does not need such intensive specialized instruction to address her educational needs, at this time."  R. at 780–81.  It also stated a "projected date IEP is to be implemented" of September 3, 2018.  R. at 766.

The IEP did not, however, identify the specific school at which the services would be provided.  Instead, the City claims that on July 12, 2018, placement officer Dinh Lu-Berio mailed a "school location letter" to V.A. containing this information.  Defs.' Mem. of Law in Supp. of Their Cross-Mtn. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("City Br.")

17–18, ECF No. 40.[2]  V.A. claims that she never received this
letter or any other communication from the City indicating the
school to which K.A.D. would be designated for the 2018 school
year.  SRO Decision 25; Pl. Mot. for Summ. J. ("Pl. Br.") 14,
ECF No. 32-2.

During the administrative proceedings, the City
produced a copy of a school location letter addressed to V.A.
R. at 783–84; *see also* R. at 158:2–10.  This letter specifies
placement at the Collaborative Arts Middle School in Queens for
K.A.D.  *Id.* at 783.  Despite the claim that Lu-Berio mailed it
on July 12, the letter bears a date of September 9, 2018.  *Id.;*
*see* Pl. Br. 14; City Br. 17.  This date was four days after the
2018–19 school year began.  *See* R. at 603:23–605:8 (parties
stipulating that September 5, 2018, was the beginning of the
school year).  The City says this date is erroneous and resulted
from an otherwise unspecified "computer programming error."
Defs.' Letter Dated Sept. 17, 2021 ("City Letter"), at 2, ECF
No. 44.  The City argues that SESIS, a City student-information
database, "generated dates for documents based on the start date
of each school year, which CSE staff could not modify."  *Id.* at
2.  But as stipulated before the IHO, September 5, 2018 was the

---

[2] Page numbers in citations to briefs refer to ECF pagination rather
than the documents' native page numbers.

first day of school, not September 9 (which was a Sunday).  The
City thus has offered no logical explanation for why September 9
was printed on the letter.

In support of its claim that Lu-Berio actually mailed
the letter in June, the City relies on Lu-Berio's testimony and
a documentary record from the SESIS database.  R. at 798-804;
*see also* R. at 605:9-611:12; City Letter 2 n.3.[3]  The SESIS
record in question reports that on July 12, 2018, Lu-Berio
mailed a letter related to a "prior notice package for
placement," R. at 799 (more on that package below).

V.A. says that without a school designation from the
City, she sought a "unilateral placement" for K.A.D. at the
Lowell School in August 2018.  Pl.'s Rule 56.1 Statement ("Pl.
56.1") ¶ 2, ECF No. 32-1.  As discussed more fully below, the
IDEA entitles the parents of learning-disabled children to
reimbursement for private tuition under certain circumstances.
*See* 34 C.F.R. § 300.148(c)-(e).  To obtain such reimbursement,
and as relevant here, parents are required to give written
notice to the public agency at least ten business days "prior to

---

[3] The City describes SESIS as "DOE's computerized Special Education
Student Information System, which is a DOE record-keeping system wherein
special education records are stored, and which supports users in completing
special education workflow processes from referral through IEP development
and implementation."  City Letter 2 n.3.

the removal of the child from the public school." *Id.*
§ 300.148(d)(1).

Accordingly, in August 2018, V.A. (through counsel)
sent a letter by email to the CSE, indicating that she intended
unilaterally to place K.A.D. at the Lowell School for 2018–19
school year, beginning September 4, 2018. R. at 676–78.[4] In the
letter, V.A. challenged the IEP on both procedural grounds, such
as the composition of the IEP team, and substantive grounds,
such as the alleged failure adequately to consider K.A.D.'s
specific needs. *Id.* The letter did not mention that V.A. was
still awaiting news of K.A.D.'s school location, but nor did it
give any indication that she had received the school location.
V.A.'s letter did not mention Collaborative Arts Middle School,
the school named in the location letter that the City
purportedly mailed, at all.

In another letter dated September 10, 2018, V.A.
stated that the CSE had "acknowledged" "transmission" of the
letter. R. at 680. Although this acknowledgement does not
appear to be contained in the record, the City does not contest
this statement. Nor does the City claim that a new school

_____

[4] The record does not reveal the exact date on which this letter was
sent. Although it is dated August 17, 2019, V.A.'s counsel subsequently
stated that it was "emailed to the CSE on or about August 19, 2018." R. at
680. Regardless, the City does not contend that V.A.'s ten-day notice was
untimely.

location letter, or any other correspondence identifying the
school, was mailed in response to V.A.'s letter.  *See* R. at
632:12–635:17.

On V.A. then enrolled K.A.D. at the Lowell School for the
2018–19 school year.  R. at 593:6–8.  Tuition for that year cost
$41,659, plus or minus any adjustment that the New York State
Education Department would set for that year.  R. at 683.[5]

**B.   Local and State Administrative Proceedings**

On September 28, 2018, V.A. filed a due process
complaint with the New York City Department of Education,
seeking reimbursement for the full amount of 2018–19 tuition as
well as attorney's fees.  R. at 874–78; Pl. 56.1 ¶ 8.  The
complaint triggered the due process procedures of the IDEA.  *See*
34 C.F.R. § 300.148(b).

The IDEA entitles parents to an "impartial due process
hearing" conducted by an "impartial hearing officer" (IHO), who
is appointed by the City.  20 U.S.C. § 1415(f), (*i*)(1)(A); 34
C.F.R. § 300.511(a); N.Y. Educ. Law § 4404(1).  A parent may
appeal an adverse decision from the IHO to the state educational

---

[5] Because of financial hardship, V.A. does not appear to have paid the
full amount as of the time of the IHO hearing.  R. at 592:1–24.  However, the
Lowell School provided a sworn and notarized statement that V.A. contracted
with the school for $41.659.00 of tuition for the 2018–2019 school year, plus
or minus any adjustment made by the State, and V.A. testified that she
remained liable for the unpaid portion of that amount.  R. at 593:4–13, 683.
Nor has the City contested this amount.  Thus, I treat this amount as the
"cost of [K.A.D.'s] enrollment" that is at issue.  34 C.F.R. § 300.148(b).

agency — in New York, the State Department of Education.  *E.F. v. Adams*, No. 21-CV-11150, 2022 WL 601999, at *2 (S.D.N.Y. Mar. 1, 2022).  A state official will then "conduct an impartial review of the findings and decision."  20 U.S.C. § 1415(g)(2); *see also id.* § 1415(*i*)(1)(B); 34 C.F.R. § 300.514(b).  The official conducting such a review is referred to as a "state review officer" (SRO).  N.Y. Educ. Law § 4404(2).  *See generally M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 n.4 (2d Cir. 2012) (explaining the "confusing, alphabet-soup nature of IDEA cases brought in New York City").

The IHO heard evidence from seven witnesses, including DOE employee Dinh Lu-Berio, who testified by telephone.  R. at 611:20-649:23.  Lu-Berio testified that she mailed the letter on July 12, 2018.  R. at 620:12-17.  I discuss her testimony in further detail below.

On August 19, 2019, the IHO issued findings of fact and a decision.  R. at 7-48.  The IHO rejected K.A.D.'s parents' argument that they had not received the school location letter, reasoning that they had not "assert[ed] in their ten day notice that they had not received a site offer" and that "[h]ad they provided such a notice, the DOE would have been able to cure that problem."  R. at 44.  The IHO also determined that the IEP was substantively adequate and had offered K.A.D. a FAPE.  R. at 41-44.

V.A. timely sought state review of the IHO's decision. *See* R. at 880; *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 279.4(a).  On November 18, 2018, the SRO issued a decision dismissing V.A.'s appeal.  SRO Decision 26.  The SRO first upheld the IHO's determination that the IEP had provided "an appropriate setting" for K.A.D. at Collaborative Arts.  *Id.* at 24.

Turning to the mailing issue, the SRO found that "in light of the immense . . . size of the district in this case, it is reasonable to hold that . . . the district was required to notify the parent where the IEP services would be implemented before the IEP went into effect as part of its obligations to implement the student's services."  *Id.* at 24.  However, relying on Lu-Berio's testimony, the SRO found that the City was entitled to "the presumption of mailing and receipt of the school location letter by the parent" and that "the IHO was free to accept [Lu-Berio's] testimony when weighting [sic] evidence relevant to the issue."  *Id.* at 25-26 (citing New York law). The SRO also reasoned that the IHO reasonably "question[ed]" V.A.'s failure to raise the lack of a letter in her ten-day notice.  *Id.* at 25.

Having exhausted the IDEA's administrative procedures, *see Mrs. W. v. Tirozzi*, 832 F.3d 748, 756 (2d Cir. 1987), V.A. then timely filed the instant suit seeking review of the SRO's

decision.  Compl. 1, ECF No. 1; *see* 20 U.S.C. § 1415(*i*)(2)(B); N.Y. Educ. Law § 4404(3)(a).

## II. Jurisdiction

The IDEA grants district courts jurisdiction over appeals from the findings and decision of an SRO.  20 U.S.C. § 1415(*i*)(1)(B), (2)(A).

## III. Standard of Review

"Though the parties in an IDEA action may call the procedure a motion for summary judgment, the procedure is in substance an appeal from an administrative determination, not a summary judgment motion."  *M.H.*, 685 F.3d at 226.  "The review is substantive and considers more than whether a material fact is disputed."  *M.Z. v. N.Y.C. Dep't of Educ.*, No. 12-CV-4111, 2013 WL 1314992, at *1 (S.D.N.Y. Mar. 21, 2013).  "[B]asing its decision on the preponderance of the evidence, [the court] shall grant such relief as [it] determines is appropriate."  20 U.S.C. § 1415(*i*)(2)(C)(iii).  "[T]he standard for reviewing administrative determinations requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review."  *M.H.*, 685 F.3d at 244.

In deciding an IDEA case, a court will "generally defer to the final decision of the state authorities."  *M.H.*, 685 F.3d at 241.  Still, "in policing the states' adjudication

of IDEA matters," a court must "determin[e] the weight due any particular administrative finding."  *Id.* at 244.  Because of the specialized educational considerations involved, "[d]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."  *Id.*  District courts also apply a deferential standard of review to the IHO's credibility determinations.  *See id.* at 240.

The call for deference, however, does not apply to questions of law.  *See B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 356 (E.D.N.Y. 2014) (the deferential standard "is not implicated with respect to issues of law, such as the proper interpretation of the federal statute and its requirements").  Here, the primary question is whether the SRO and IHO correctly concluded that the presumption of mailing applied.  This is a question of New York state law — one that applies much more broadly than just in the IDEA hearing context.  *See, e.g.*, *CIT Bank N.A. v. Schiffman* ("*CIT Bank III*"), 999 F.3d 113, 118 (2d Cir. 2021) (foreclosure); *N.Y. & Presbyterian Hosp. v. Allstate Ins. Co.*, 814 N.Y.S.2d 687, 688 (App. Div. 2d Dept. 2006) (insurance).

**IV. Discussion**

Parents' claims for retroactive tuition reimbursement under the IDEA are assessed under the *Burlington* / *Carter* test. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). The test includes three substantive factors: "(1) whether the school district's proposed plan [the IEP] will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). The burden of proof shifts in this analysis: the school district "bears the initial burden of establishing the validity of its plan"; if it fails to do so, the parents then "bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184–85.

Given the uncertainty surrounding the mailing of the school location letter, the City failed (at the first step) to demonstrate that its plan provided K.A.D. with a FAPE — at least on a timely basis. Simply put, a school district that fails to tell a parent where it proposes to send her child to school cannot carry its burden of demonstrating that it proposed a valid plan for that student. Remand is appropriate, however, on the questions of whether the placement of K.A.D. at the Lowell

School was appropriate to her needs, as discussed below, and whether the equities favor relief.

## A.    **The City Did Not Offer a FAPE**

Review of an SRO's determination that a FAPE was properly offered "should proceed on two levels." *M.H.*, 685 F.3d at 242.  "First, the district court should ask whether the State has complied with the procedures set forth by the [A]ct." *Id.* And "second, the court should decide whether the individualized educational program developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." *Id.*  Given the State's failure to establish when (or even if) it mailed the school location letter, its case falters at the first of these levels — the procedural level.  The IHO and SRO erred in determining otherwise.

### 1.    School Placement and Procedural Violations

The IDEA requires that "[a]t the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP."  34 C.F.R. § 300.323(a).  Failure to provide an adequate IEP amounts to depriving the student of a FAPE.  *See Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015).

V.A. argues that the City did not meet this requirement because it failed to notify her of the school where K.A.D. would be placed for the 2018−19 school year.  Although

V.A. does not precisely situate her argument within the IDEA's structure, her argument appears to be that the City violated the requirement that the IEP include the "frequency, *location*, and duration" of the "services" to be provided.  34 C.F.R. § 300.320(a)(7) (emphasis added); *see* Pl. Br. 13–14 (citing 34 C.F.R. § 300.323(a)).  The City responds that it did notify V.A. of the school placement by mailing the school location letter in July 2018.  City Br. 17.

Despite the reference to "location" in Section 300.320(a)(7), the Second Circuit has held that it is not a *per se* procedural violation for the IEP to omit the name of the specific school, with such information to follow.  *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419–20 (2d Cir. 2009); *see also C.F.*, 746 F.3d at 79.  Still, the school designation cannot come so late that it impedes the parents' ability to participate meaningfully in the school selection process.  *S.Y. v. N.Y.C. Dep't of Educ.*, 210 F. Supp. 3d 556, 574–75 (S.D.N.Y. 2016).  For instance, a procedural violation occurred where the equivalent of a school location letter was sent "on June 15 for a school year beginning on July 6," *id.* at 574 (citing *FB v. N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522, 541–43 (S.D.N.Y. 2015)); "on June 18 for a school year beginning on July 5," *id.* (citing *C.U. v. N.Y.C. Dep't of Educ.*, 23 F.

Supp. 3d 210, 227 (S.D.N.Y. 2014)); and on June 18 for a school
year beginning on July 2, *id.* at 574.

It obviously follows that a school district commits a
procedural violation when it fails to send a school location
letter at all.  *C.U.*, 23 F. Supp. 3d at 228 (procedural
violation occurred where the school was identified to the
parents so late that they were unable to visit it).  As a
result, the key question in this case is whether the City
properly mailed the letter.  The SHO found that it did, but not
because of any evidence that V.A. had actually received the
letter.  Instead, the SRO invoked a "presumption" arising under
New York law to conclude that the mailing occurred.

Under New York law, the City may show proper mailing
of the school location letter in two ways: (1) "through evidence
of actual mailing (*e.g.,* an affidavit of mailing or service)";
or (2) "by proof of a sender's routine business practice with
respect to the creation, addressing, and mailing of documents of
that nature."  *CIT Bank N.A. v. Schiffman* ("*CIT Bank II*"), 168
N.E.3d 1138, 1142 (N.Y. 2021).  Like the IHO and SRO, the City
relies primarily, if not exclusively, on the second option here.
*See* City Br. 17–18; City Letter 2–3.

2.   The Presumption of Mailing: "Regular Office Procedure"

In New York, "a presumption of receipt arises
where . . . the record establishes office procedures, followed

in the regular course of business, pursuant to which notices have been addressed and mailed." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010) (citing *Nassau Ins. Co. v. Murray,* 386 N.E.2d 1085, 1086 (N.Y. 1978) (mem.)).  "[P]ersonal knowledge is required only to establish regular office procedure, not the particular mailing." *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985).  But "[i]n order for the presumption to arise, the office practice must be geared so as to ensure the likelihood that the notice is always properly addressed and mailed." *CIT Bank II*, 168 N.E.3d at 1142 (quoting *Nassau*, 386 N.E.2d at 1085).[6]  This is key to invoking the presumption: the proffered procedures must be effectively "geared" to inspire confidence on the disputed aspect of the mailing.  Here, the dispute surrounds when and whether the letter was sent, and the City's "procedures," such as they were, do not inspire sufficient confidence to warrant the presumption's application.

---

[6] If a presumption is thus created, it may be rebutted by "proof of a material deviation from an aspect of the office procedure that would call into doubt whether the [document] was properly mailed." *CIT Bank II*, 168 N.E.3d at 1143; *see also Meckel*, 758 F.2d at 817; *Weiss v. Macy's Retail Holdings, Inc.*, 741 F. App'x 24, 28 (2d Cir. 2018) (citing cases).  Given that I conclude the presumption was not created here, I need not reach the question whether it was rebutted.

a.   Evidence of Mailing Offered by the City

As discussed, the parties do not dispute that the letter showed September 9 in the date field, or that the Collaborative Arts' school year actually began on September 5. *See* City Br. 17.  The City claims, rather, that the letter was actually mailed in July.  City Br. 17–18.

The only evidence on this point is the testimony of City employee Dinh Lu-Berio and the SESIS record on which she relied.  *See* City Letter 2–3.  Lu-Berio testified that as the placement officer for the City's Committee on Special Education 3, she was responsible for mailing school location letters.  R. at 615:7–616:4.  She testified that she sent "a lot of" school location letters each year, though she could not quantify the number.  R. at 641:22–642:10.

Lu-Berio did not testify to having an independent recollection of mailing K.A.D.'s school location letter on a particular date.  Rather, her testimony relied on the SESIS printout.  *See* R. at 617:16–19 (offering no answer to the question of "when was placement secured" for K.A.D.); R. at 618:5–7 ("Please, I would like to sign on into our database for SESIS, so that I can give exact dates of when the letter was mailed out."); R. at 619:18–19 (hearing officer noting that Lu-Berio "ha[d] the documents now" before testimony continued); R.

18

at 620:12-17 (Lu-Berio referring to the SESIS printout to

conclude that the letter was mailed on July 12, 2018).

Given that the CSE's mailing procedures were at the

core of the dispute, it is striking that the City's advocate

asked Lu-Berio no questions about those procedures during direct

testimony.  *See* R. at 615:4-620:8.  Indeed, the City's

representative did not even pose a question that called clearly

for the date on which K.A.D.'s school location letter was

mailed.  Instead, once the SESIS record was in front of Lu-

Berio, the City's representative simply asked her when K.A.D.'s

placement was "secured":

> MR. MONTANO: So my question to you, Ms. Lu-Berio, is
> simply, the school location letter for [K.A.D.]
> indicating placement at Collaborative Arts Middle
> School, when was that placement actually secured?
>
> MS. LU-BERIO: It was secured July 12, 2018.
>
> MR. MONTANO: And how was that information, if at all,
> communicated to the parent?
>
> MS. LU-BERIO: So once placement is secured through
> SESIS, I finalize the document and I mail it to the
> parent.
>
> MR. MONTANO: Okay.  Nothing further.

R. at 619:21-620:8.

To the extent Lu-Berio described her process at all,

she did so on cross-examination and upon questioning by the IHO.

When V.A.'s counsel asked, on cross, "how do you know" that the

location letter was transmitted on July 12, Lu-Berio responded:

"Because I'm a very procedural person.  When I finalize an IEP —
I'm sorry, when I finalize a prior notice package, I print out
the school location letter and I personally fold the letter and
put it into an envelope and put it in the mail."  R. at 642:11-
21.

        The school location letter was introduced in evidence.
R. at 158:2-12, 783-84.  Lu-Berio could not clearly explain why
the letter was dated September 9.  On direct examination, she
implied that September 9 was the start of the school year for
the designated school.  R. at 617:10-14 (stating that "the date
populates as a September start date, because that's when the
school location letter is [sic] for that school").  She made
this same assertion more clearly on cross, testifying that "as I
stated earlier," the letter would "automatically generate with
the September date, because the school location letter is
corresponding to the start date for that school year."  R. at
636:3-9.

        Later on cross, however, she attributed the date
discrepancy to a "SESIS programming issue" that she could not
explain.  R. at 643:23-644:11, 647:6-649:3.  And on further
questioning by the IHO, she acknowledged that September 9 was
not, in fact, the first day of the school year — Collaborative
Arts' school year began on September 5 — and that she "d[id] not
know" why the September 9 date populated.  R. at 648:4-15.  Lu-

Berio testified that she did not correct the erroneous date by
hand because to do so would have been, in her view,
"manipulating a legal document."  R. at 649:4-12.

The SESIS log does not meaningfully fill the gaps in
Lu-Berio's testimony about CSE procedures.  *See* City Letter 2.
The entry that the City points to, dated July 12, 2018, does not
refer to a school location letter by that name (or any specific
identifier).  It states: "Prior Notice Package for Placement
sent for [K.A.D.] // Letter sent today."  R. at 799.  Lu-Berio
explained that the school location letter is a component of the
"prior notice package," which may be sent in separate parts.  R.
at 621:18-22 (MS. LU-BERIO: "The school location letter is part
of the prior notice package.  So the . . . line that says prior
notice package for placement for [K.A.D.], letter sent today,
that was the school location letter."); *see also id.* at 639:20-
640:17; City Letter 2 n.1.  The entry indicates the "User" as
"DLU," a reference to Lu-Berio.  R. at 799.

Ultimately, Lu-Berio acknowledged that the SESIS log
does not expressly indicate what kind of letter was sent, even
though it would have been "appropriate" to do so:

MS. HARTLEY:  So is there any indication anywhere,
based on what you did, that indicated that a school
location letter was sent?

MS. LU-BERIO:  Not written in the [SESIS log] events,
no.

R. at 639:5–14; *see also* R. at 630:22–631:1.  Lu-Berio also

conceded that no other SESIS entry would have corresponded to

the school location letter.  R. at 632:2–6.  She explained,

however, that the letters she sends almost exclusively consist

of school location letters.  R. at 641:7–17 (asked by the IHO,

"is that the only kind of letter that you ever send out," Lu-

Berio responds "[f]or the most part, yes").

>     b.   No Presumption of Mailing Has Been Established

The evidence proffered by the City is insufficient to

give rise to the presumption of mailing.  The presumption has

been successfully invoked, generally speaking, in cases

featuring much more detailed explanations of office mailing

procedures.  For example, the Second Circuit found that a bank

established the presumption where one of its managers testified

not only that the list of addresses was obtained "from a

computer registry," but also about the "four methods" the bank

used to ensure "the number of labels, envelopes, stuffed

envelopes and stamped envelopes conformed to the count of

[addressees] as of the record date."  *Meckel*, 758 F.2d at 814–

15, 817; *cf. CIT Bank III*, 999 F.3d at 118; *CIT Bank N.A. v.

Schiffman* ("*CIT Bank I*"), 948 F.3d 529, 533–34 (2d Cir. 2020)

(bank established the presumption by submitting an employee's

sworn affidavit detailing the bank's mailing procedures).

Similarly, the Appellate Division found that an insurance company could successfully invoke the presumption where:

> [T]he documentary evidence established that a notice was generated for [the policyholder's] policy during the year in which the lead exclusion was added to the policy.  In addition, [the company] submitted evidence that it placed the notices in envelopes with windows so that the address on the notice was the one used for mailing.  The envelopes were then delivered to the mail room, where they were sealed and the appropriate postage was added.  Thereafter, the mail was hand delivered to the post office that was located adjacent to [the company's] parking lot.

*Preferred Mut. Ins. Co. v. Donnelly*, 974 N.Y.S.2d 682, 684 (App. Div. 4th Dept. 2013).  Similar cases abound.  *See, e.g.*, *Badio v. Liberty Mut. Fire Ins. Co.*, 785 N.Y.S.2d 52, 54 (App. Div. 1st Dept. 2004) (presumption of mailing was established where the sender "present[ed] the testimony of an employee who possessed personal knowledge of the office mailing practice, including how the mail was picked up and counted, and how the names and addresses on each item were confirmed," in addition to "the signed and stamped certificate of mailing"); *cf. Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993) (presumption of mailing was established where the sender produced both "file copies of [the] documents" and "affidavits as to the regular office mailing procedures followed with respect to their mailing").  Indeed, in *T.C. v. New York City Department of Education*, the district court found that the City had established a presumption

that it had mailed the IEP and a school placement notification
where witnesses "described the routine DOE practice for mailing
IEPs, including the computer system used by CSE staff and the
mail clerk's process for mailing," and offered "further detail
as to the data and record keeping programs used and the step-by-
step process from the generation of the [letter] to the mailroom
to the mailbox."  No. 15-CV-3477, 2016 WL 1261137, at *10
(S.D.N.Y. Mar. 30, 2016).

      In contrast, New York courts refuse to accord a
presumption where the sender provided insufficiently detailed
information.  For instance, in *Progressive Casualty Insurance
Co. v. Infinite Ortho Products, Inc.*, the Second Department held
that the presumption did not apply where the sender failed to
"state, in his affidavit," (1) "how the envelopes were addressed
so as to ensure that the address was correct or whether the
envelope was addressed by the automated system or by an
employee," and (2) "how and when the envelopes, once sealed,
weighed, and affixed with postage using the automated system,
were transferred to the care and custody of the United States
Postal Service or some other carrier or messenger service to be
delivered."  7 N.Y.S.3d 429, 431–32 (App. Div. 2d Dept. 2015).
Other cases are similar.  *See, e.g.*, *Progressive Cas. Ins. Co.
v. Metro Psychological Servs., P.C.*, 32 N.Y.S.3d 182, 184 (App.
Div. 2d Dept. 2016) (no presumption established where the

evidence consisted of only "conclusory allegations regarding [a sender's] office practice and procedure, and failed to establish that the practice and procedure was designed to ensure that the . . . letters were addressed to the proper party and properly mailed").

In light of these authorities, Lu-Berio's testimony falls short of establishing an "office practice . . . geared so as to ensure the likelihood that [school location letters] [are] always properly addressed and mailed." *CIT Bank II*, 168 N.E.3d at 1142. In this case, given the IDEA's requirements, "properly addressed and mailed" requires two showings: (1) that the mailing was correctly addressed to V.A., and (2) that it was timely mailed. But there is insufficient evidence here of regular practice relating to either. Lu-Berio testified only that she printed and folded the letter, put it in an envelope, and "put it in the mail." R. at 642:18–21.[7] As in *Infinite Ortho*, there is no evidence about whether the address was verified, whether adequate postage was applied, or —

---

[7] At oral argument, when asked to identify the "processes" that DOE uses for such mailings, counsel for the City added only that "the DOE mails the school placement letter, essentially informing the parent what school the DOE recommends for the student's placement," "prior to the start of the school year." Tr. of Oral Arg. 24:23–25:15, ECF No. 46.

critically — where, when, or by whom the letter was tendered to the Postal Service.  *See* 7 N.Y.S.3d at 431–32.[8]

On this last question, it is unclear what Lu-Berio meant by "put[ting] [the letter] in the mail."  R. at 642:20–21. That statement could mean any one of several things: (1) that she placed the sealed envelope in some sort of internal outbox for another person to stamp and deliver to the custody of the Postal Service; (2) that she affixed postage but had another person deliver the stamped letter to the Postal Service; (3) that she affixed postage and delivered the letter to a post office or USPS collection box herself; or (4) something in between.  Without this clarification, the City's contention must fail.  *Cf. J.T.M. Grp., Inc. v. Fleischman*, No. 2000-1797SC, 2001 WL 1665333, at *1 (N.Y. App. Term 2d Dept. Oct. 24, 2001) ("mere belief" that an unidentified employee took document from an attorney's mailbox and completed all the steps in the mailing process was insufficient to establish the presumption).

The City thus has not shown that it is entitled to a presumption of mailing.

---

[8] Although the school location letter itself bears an address purportedly corresponding to V.A., R. at 784, the envelope is not in the record, so it cannot be ascertained whether the same name and address were shown on the envelope.

3.   <u>Proof of Actual Mailing</u>

As mentioned above, a litigant may also show that a document was mailed by showing proof of actual mailing.  *CIT Bank II*, 168 N.E.3d at 1142.  But to the extent the City contends that it has proffered such proof, *see* City Letter 2, it is incorrect.  As discussed, the City has proffered only three pieces of evidence in support of its position that it timely mailed the letter: (1) Lu-Berio's testimony; (2) the SESIS printout Lu-Berio relied upon; and (3) the purportedly misdated letter itself.  *See* City Br. 17–18; City Letter 2.  However, none of this evidence suffices as proof of actual mailing under New York law.

A litigant may establish "proof of mailing" "by certificate or by affidavit of one with personal knowledge." *Tracy v. William Penn Life Ins. Co. of N.Y.*, 650 N.Y.S.2d 907, 909–10 (App. Div. 3d Dept. 1996).  However, where a sender asserts that his office mailed a letter on a certain date, but "d[id] not state that he had personal knowledge of the mailing," no proof of actual mailing is established.  *Bank of Am. v. Guillaume*, 94 N.Y.S.3d 114, 115 (App. Div. 2d Dept. 2019).  As discussed, it is evident that at the time of her testimony, Lu-Berio lacked personal knowledge of the mailing, given that she requested to look at, then explicitly relied on, the SESIS log. *See* R. at 618:5–7, 619:18–19, 620:12–17.  Indeed, after the

first time Lu-Berio is asked about the date she purportedly mailed the letter, and before she answered, the parties and hearing officer spend the next two pages of the hearing transcript getting the exhibit containing the SESIS log into Lu-Berio's hands.  R. at 617:16–619:25.

Alternatively, proof of mailing may be established by "certificate."  *Tracy*, 650 N.Y.S.2d at 909.  But the City falls short of meeting this requirement here.  "An addressee's signature on a certified mail return receipt supports a finding that the addressee received the notice."  *State Farm Mut. Auto. Ins. Co. v. Kankam*, 770 N.Y.S.2d 714, 716 (App. Div. 1st Dept. 2004).  But even a "certified mail receipt bear[ing] a postmark date" is insufficient where "there was no evidence that the [document] was mailed under that certified mail receipt number."  *Guillaume*, 94 N.Y.S.3d at 115–16.  Here, all the City has produced is the letter itself, without any indicia of when, or where, or to whom — or even if — it was actually mailed.  Thus, the City has not shown evidence of actual mailing.

4.  <u>The Procedural Error Warrants Relief</u>

To succeed on her claim that a procedural violation occurred, V.A. must demonstrate not only that the City failed to provide timely notice of the school placement, but also that the failure was sufficiently grave to warrant relief.  "Procedural violations only entitle parents to reimbursement if they

28

'impeded the child's right to a free appropriate public education,' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *C.F.*, 746 F.3d at 78-79 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).  In contrast, "[s]ubstantive inadequacy automatically entitles the parents to reimbursement."  *R.E.*, 694 F.3d at 190.

As discussed above, the failure to identify any school at which the IEP services would be provided constituted a serious procedural error.  Moreover, the failure to identify a school meant that V.A. was "unable to arrange a visit to [the school] or to inquire about its facilities or programs," *C.U.*, 23 F. Supp. 3d at 228, or otherwise "meaningfully participate in the school selection process."  *FB*, 132 F. Supp. 3d at 542.  Thus, "[b]ecause this violation significantly impeded [V.A.'s] opportunity to participate in the decision making process concerning the provision of the FAPE, this procedural violation constitutes a denial of a FAPE and satisfies the first element of the *Burlington-Carter* test."  *C.U.*, 23 F. Supp. 3d at 228.

Thus, the City's procedural error here warrants relief.

5.   Deference to the SRO Decision Is Not Warranted

Finally, I address the City's argument that this Court should defer to the SRO's decision under the heightened

deference standards typically applicable in IDEA cases.  City
Br. 14-15.  This contention fails for reasons alluded to above —
namely, it does not implicate the educational expertise of SROs
and IHOs.

Deference to an SRO's decision is generally
appropriate because "the judiciary generally lacks the
specialized knowledge and experience necessary to resolve
persistent and difficult questions of educational policy."
*R.E.*, 694 F.3d at 184.  Accordingly, "[r]eview of the
administrative decision is by no means an invitation to the
courts to substitute their own notions of sound educational
policy for those of the school authorities which they review."
*Mr. P. v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 748 (2d Cir.
2018).

But no such policy or expertise concerns are present
here, where the issue is purely one of general New York law.
There is no reason to think that state educational authorities
are better-equipped than courts to resolve a matter of New York
civil procedure, and the City cites no authority suggesting
otherwise.  *See generally M.H.*, 685 F.3d at 244 (the decision
whether to defer "must . . . be colored by an acute awareness of
institutional competence and role").

Nor was the SRO's decision "based on substantially
greater familiarity with the evidence and the witnesses than the

reviewing court." *Id.* The relevant evidence is quite cabined, easily identified by the parties and this Court, and of the type federal courts are frequently called upon to evaluate. *See, e.g.*, *CIT Bank II*, 168 N.E.3d at 1143–44 (New York Court of Appeals leaving the application of the presumption rules to the Second Circuit); *CIT Bank III*, 999 F.3d at 118 (Second Circuit resolving the issue whether the presumption of mailing was established). And in particular, Lu-Berio's credibility is not at issue here: even if her testimony were assumed to be completely true, the City still could not show — given the analysis above — that it timely mailed the school location letter.[9]

Thus, deference to the SRO's decision is not appropriate on the mailing issue.

**B. Remand Is Appropriate to Determine Whether the Lowell School Was An "Appropriate" Placement**

Even if the City failed properly to offer a valid plan for K.A.D. to receive a FAPE, V.A. must still "establish[] the appropriateness of their private placement and that the equities favor [her]." *R.E.*, 694 F.3d at 184–85. Notably, the City has presented no argument responding to V.A.'s contentions that both

---

[9] The court in *T.C.* found "the SRO's conclusion [about a presumption of mailing applying] is entitled to deference" because it was "well-reasoned and supported by the record." 2016 WL 1261137, at *7. For the reasons discussed, I decline to defer to the administrative hearing officers on this issue.

these requirements are satisfied. *See* City Br. 18 (stating, with no further argument, that "since DOE offered the student a FAPE, consideration of Prongs II and III of the Burlington / Carter test is not necessary"); Tr. of Oral Arg. 34:2–7, ECF No. 46.

For a placement to be "appropriate" under the second prong of the *Burlington / Carter* test, it must be "reasonably calculated to enable the child to receive educational benefits." *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006). This inquiry is less exacting than the inquiry that would apply to determine the appropriateness of an IEP. *See id.* at 364. The parent "need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id.* at 365. "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Id.* at 364.

Because the SRO did not reach the issue of whether the Lowell placement was appropriate, *see* City 56.1 ¶ 23, I must "look to the opinion of the IHO," who did address the issue. *C.F.*, 746 F.3d at 82. The IHO found that Lowell was not

appropriate because it "provides too little remediation" and did
not "provide [K.A.D.] with a class which is slowly paced enough
to make her feel capable of doing what is expected."  R. at 44.
Importantly, unlike with the mailing issue, the usual
deferential standard does apply here.  *See C.F.*, 746 F.3d at 82.

However, notwithstanding that standard, I find the
IHO's decision to be inadequate on this issue.  In particular,
several conclusions of the IHO do not appear to be sufficiently
supported by evidence.  For instance, the IHO found that the
testimony by Lowell School educators showing that K.A.D. had
made academic progress "ignores or contradicts the fact that
[K.A.D.] is still struggling with reading: her reading fluency
was at a grade 4.1 and her reading comprehension was at a grade
3.9."  R. at 43.  But despite the reference to K.A.D. "still
struggling," these figures appear to come from a 2017
neuropsychological evaluation, R. at 714, and thus could not
measure her comprehension or progress during the 2018–19 school
year.  In contrast, a standardized test that was actually
administered to K.A.D. in December 2018 indicated that K.A.D.'s
"basic reading skills are above grade level (9th Grade)."  R. at
67.

Moreover, other evidence not considered by the IHO
appears to suggest that the Lowell School was an appropriate
placement for K.A.D.  First, K.A.D. attended Lowell not only for

seventh grade (the year prior to the year at issue), but also
for at least one subsequent year.  Specifically, at oral
argument in December 2021, V.A.'s counsel indicated that K.A.D.
was then attending the Lowell School as a "funded student," with
the funding provided by DOE.  Tr. of Oral Arg. 16:24–17:18.
Counsel for the City did not contradict this representation.
This subsequent development is relevant because although "the
IEP must be evaluated prospectively as of the time of its
drafting," the Second Circuit also has "reject[ed] . . . a rigid
'four corners' rule prohibiting testimony that goes beyond the
face of the IEP."  *R.E.*, 694 F.3d at 186; *see also D.S. v.
Bayonne Bd. of Educ.,* 602 F.3d 553, 564–65 (3d Cir. 2010) ("[A]
court should determine the appropriateness of an IEP as of the
time it was made, and should use evidence acquired subsequently
to the creation of an IEP only to evaluate the reasonableness of
the school district's decisions at the time they were made."),
*quoted by R.E.*, 694 F.3d at 186.  It is thus difficult to see
how a placement that was seen as appropriate — and that was paid
for — by the City for K.A.D.'s seventh and (presumably) tenth
grades would be inappropriate for her eighth grade, especially
under the lower standards applicable to a unilateral placement.

     Additionally, Lowell appears to have provided all, or
at least certainly the great majority, of the services
recommended by the IEP.  At Lowell, K.A.D. received individual

and group occupational therapy, individual physical therapy, and group speech-language therapy.  R. at 689; *cf.* R. at 735–36 (IEP recommending these services).  Moreover, K.A.D. was provided with a licensed school psychologist as her counselor, who was "available to her as needed," to support her social and emotional functioning needs.  R. at 409:8–13.  And to address K.A.D.'s anxiety, the school would "group[] [her] with students who are going to be supportive to her," as well as provide additional supports as necessary, such as warning K.A.D. of any changes to her routine.  R. at 409:14–22.

But even given the shortcomings of the IHO's decision, the question whether the Lowell placement was appropriate is one that requires educational expertise, and thus remand is appropriate.  *See D.N. v. N.Y.C. Dep't of Educ.*, 905 F. Supp. 2d 582, 589 (S.D.N.Y. 2012); *see also N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-5120, 2011 WL 3273922, at *11 (E.D.N.Y. July 29, 2011) (case law suggests that "remand is appropriate where the district court has received insufficient guidance from state administrative agencies as to the merits of a case"); *cf. id.* (while a district court "may remand for clarification or correction of an incorrect or unhelpful SRO decision," the court "need not do so when the IHO's determination offers well-reasoned and persuasive guidance").  The Court passes no judgment on whether V.A.'s unilateral placement of K.A.D. at the

Lowell School was appropriate, and on remand, the SRO should
make a determination on this issue in the first instance.

**C.   Remand Is Appropriate to Determine Whether the Equities
       Favor Relief**

Finally, V.A. must show that the equities favor
reimbursement.  *See Frank G.*, 459 F.3d at 363–64 ("[B]ecause the
authority to grant reimbursement is discretionary, equitable
considerations relating to the reasonableness of the action
taken by the parents are relevant in fashioning relief.").  The
SRO and IHO did not assess the balance of the equities
comprehensively.  *See* City 56.1 ¶ 23; SRO Decision 25; R. at 44.
Moreover, certain considerations relevant to the equitable
determination may implicate issues of educational policy, such
as whether V.A. gave the City "adequate notice of the
withdrawal" and "whether the amount of private-school tuition
was reasonable."  *E.M. ex rel. N.M. v. N.Y.C. Dep't of Educ.*,
758 F.3d 442, 461 (2d Cir. 2014).  Remand is therefore necessary
on this issue.  *See M.H.*, 685 F.3d at 254 ("[B]oth
administrative review officers and courts are required to
evaluate the equities in considering a tuition reimbursement
claim.").

**V.   Conclusion**

For these reasons, the SRO's decision dismissing the
appeal is vacated.  V.A.'s motion for summary judgment is

granted, and the City's cross-motion is denied, on all issues herein discussed except for the appropriateness of K.A.D.'s unilateral placement at the Lowell School and the balance of equities.  The IHO's conclusions regarding the appropriateness of K.A.D.'s placement are remanded to the SRO to review in the first instance.  On remand, the SRO should also determine whether V.A. has met her burden on the balance of the equities.

SO ORDERED.

/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:     May 10, 2022
           Brooklyn, New York